IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JENNIFER M. LOCKE, | ) | CASE NO. 8:14CV2 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 20) submitted by Defendant Standard Insurance Company ("Standard"). For the reasons discussed below, the Motion will be granted.

**FACTS**

Standard's statement of material facts, set out in its brief (Filing No. 28) with pinpoint citations to the evidentiary record (Filing Nos. 22-27) in compliance with NECivR 56.1(a), is not disputed by Plaintiff Jennifer M. Locke ("Locke"), and the following facts are accepted as true for purposes of the pending Motion.

Locke obtained a Disability Insurance Income Policy (the "Policy") from Standard, effective September 23, 2004.[1] The Policy (Filing No. 23 at ECF 2 *et seq*.) included the following definitions:

---

[1] The Policy application was completed and received in Nebraska in August 2004. The parties agree that Nebraska law applies. The name of the insured appearing on the Policy is Jennifer Vaughn, which the Court infers was Locke's name at the time the Policy was issued. In the Policy application, Locke revealed that she was treated for depression in 2001 at Omaha's Immanuel Hospital Behavioral Clinic, and the "Problem [was] resolved." (Filing No. 23 at ECF 34.) She also stated that she applied for insurance through Standard in 2002 and was rejected, but told she could reapply in one year. (*Id*. at ECF 33.)

> Total Disability/Totally Disabled – Because of your Injury or Sickness:
>
> 1) You are unable to perform the substantial and material duties of your regular occupation; and
>
> 2) You are not engaged in any other gainful occupation; and
>
> 3) You are under the regular care of a Physician appropriate for your injury or sickness. This Physician's care requirement will be waived when We receive written proof, satisfactory to Us, that further care would be of no benefit to you.
> . . .
>
> Regular Occupation – Your occupation at the time Disability begins. If You have limited Your practice to a professionally recognized specialty in medicine or law, the specialty will be deemed to be Your Regular Occupation.

*Id.* at ECF 12.

A one-page endorsement to the Policy, that Locke signed and dated on September 23, 2004, set out the following "**DISABILITY INCOME POLICY EXCLUSION**":

> We, Standard Insurance Company, issue this policy on the express condition that We do not assume any risk for Total or Residual Disability of the Insured if either results from:
>
>> MENTAL DISORDER: Any mental, emotional or behavioral disorder or condition regardless of the cause (including, biological or biochemical disorder or imbalance of the brain) and regardless of the presence of physical symptoms. Except as excluded below, for the purposes of this definition, mental disorder includes any diagnosis or condition listed in the most current publication of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychological Association. If this publication is no longer available, we reserve the right to use another nationally published manual of similar scope and purpose. Dementia resulting from stroke, trauma, infectious conditions or degenerative changes such as Alzheimer's disease, is not considered to be a Mental Disorder for the purpose of this exclusion.
>
> This means that We will not pay benefits or waive premiums if Total or Residual Disability is contributed to or caused by any of the above, except as expressly noted.

*Id.* at ECF 9.

2

On or about November 6, 2012, Locke advised Standard that she intended to make a claim for disability benefits.  At the time, she was obtaining in-patient care for Post Traumatic Stress Disorder ("PTSD"), depression, and anxiety, at the Life Healing Center in Santa Fe, New Mexico, following a sexual assault in April 2012.

She identified PTSD and Fibromyalgia[2] as the conditions contributing to her inability to work.  Her treating psychiatrist, Roxana Raicu, M.D., submitted an Attending Physician's Statement in conjunction with Locke's claim for disability benefits.  Dr. Raicu identified a primary diagnosis of PTSD and a secondary diagnosis of Major Depressive Disorder.  In the statement, Dr. Raicu recommended that Locke stop working because of severe anxiety and limitations in activities of daily living.

Locke submitted an Insured's Statement for individual disability benefits dated December 16, 2012.  In her statement, Locke noted that she was a Physician's Assistant and her duties consisted of patient interviews and examinations, chart reviews, and writing medical opinions.  At the time she left work[3], Locke was employed at the Veterans

---

[2] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way [the] brain processes pain signals.  Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event. Women are much more likely to develop fibromyalgia than are men. Many people who have fibromyalgia also have tension headaches, temporomandibular joint (TMJ) disorders, irritable bowel syndrome, anxiety and depression. While there is no cure for fibromyalgia, a variety of medications can help control symptoms. Exercise, relaxation and stress-reduction measures also may help."
(www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243.)

[3] It is not clear from the record precisely when Locke stopped working, though it appears to have been after the sexual assault in April 2012.

Administration, working 20-25 hours per week.  Locke stated that her disability was the result of a sickness, and she identified PTSD, first noticed in April 2012, and fibromyalgia, first noticed in January 2009.  Locke provided the following narrative as to how her sickness prevented her from working in her occupation: "I have severe anxiety and panic attacks and have difficulty leaving my house. My occupation requires contact with strangers, many men, which trigger flashbacks and anxiety attacks. Fibromyalgia pain and fatigue interfere with daily function, often unable to get out of bed."

As part of its review, Standard submitted Locke's claim to Dan Przybylowski, C.R.C., a Vocational Consultant.  Przybylowski determined that Locke's occupation as a Physician's Assistant required light physical strength with minimal other physical demands.

Standard also obtained medical information from Locke's treating physicians. The medical records included notes from Lasting Hope Recovery Center where Locke was admitted on October 15, 2012, with diagnoses of depression and generalized anxiety. She was discharged from Lasting Hope Recovery Center on October 23, 2012, after she showed significant improvements with respect to her mood, anxiety, functionality, and social interactions.  The records also included a clinical note from Dr. Michael Feely, M.D., a rheumatologist whom Locke first saw on March 21, 2012.  Locke identified aches and pain, stiffness in her hands, and fatigue.  Dr. Feely noted that Locke had several tender myofascial trigger points and several features of fibromyalgia, but refrained from making any diagnosis.  Dr. Feely did not place restrictions or limitations on Locke's ability to work.

Locke submitted medical records of three additional visits with Dr. Feely on April 24, 2012, July 18, 2012, and January 4, 2013.  Dr. Feely did not provide restrictions or limitations on Locke's work or social activities due to fibromyalgia during these visits.

4

Rather, Dr. Feely identified PTSD as the primary cause of Locke's condition. Dr. Feely stated, "I have explained to [Locke] that I feel that her fibromyalgia symptoms are unlikely to improve much unless her PTSD symptoms stabilize . . . . I don't see evidence of an active inflammatory process. I have checked radiographs of her SI joints which showed no significant abnormalities. She has been under a great deal of stress recently and I suspect that this is contributing to her musculoskeletal symptoms . . . ."

In the attending physician's statement, dated January 4, 2013, Dr. Feely diagnosed Locke with fibromyalgia and PTSD. Dr. Feely anticipated that Locke could return to work noting that it "depends on the improvement in her PTSD symptoms." With respect to a question concerning Locke's physical, mental and cognitive limitations, Dr. Feely wrote: "Patient has widespread pain due to her fibromyalgia, though it is her PTSD which limits her ability to work primarily." With respect to physical limitations, Dr. Feely left the section blank. Under physical impairment, Dr. Feely indicated that Locke was precluded from "medium manual activity (15-30%)." Under the section related to Locke's mental limitations and impairments, Dr. Feely stated, "patient has significant loss of physiological, personal and social adjustment (severe limitations)."

In the attending physician's statement, dated January 7, 2013, Lorrie McGill, M.D., wrote that Locke's condition was the "direct result of sexual trauma on 4/8/12," and identified a diagnosis of "Fibromyalgia + PTSD" and migraine headaches. Dr. McGill indicated that Locke was unable to work as of October 5, 2012, because of "severe stress, depression, headaches, suicidal" and "severe psychological stressors."

5

In the Intake Assessment at Focus on Recovery, dated January 21, 2013, an outpatient therapy program, Locke stated that she was "currently unable to work due to PTSD symptoms and panic attacks."

In the letter to Standard, dated February 21, 2013, Dr. Feely noted that Locke had "a great deal of chronic musculoskeletal pain which I believe to be on the basis of her fibromyalgia. [She] had been able to manage her symptoms relatively well until roughly six months ago at which point she was the victim of a sexual assault. With this unfortunate event she has had worsening of her pain and has been under psychiatric care for post-traumatic stress disorder. There is no doubt in my mind that her somatic symptoms and chronic pain have been much worse since the assault."

The information provided to Standard was reviewed by Ronald Fraback, M.D., a physician board-certified in rheumatology. Dr. Fraback reviewed the medical records and other information in the claim file. In his report, Dr. Fraback accepted that Locke met the American College of Rheumatology criteria for fibromyalgia. Dr. Fraback noted, however, that "while I appreciate the opinion of Dr. Feely, it appears that [Locke's] primary issues are psychiatric. I do not find evidence that her fibromyalgia alone should preclude sedentary to light level work." Dr. Fraback further stated that Locke's inability to work "is primarily due to her PTSD. The fibromyalgia would be contributory."

Locke's file was also reviewed by Esther Gwinnell, M.D., a board certified Psychiatrist. Based on her review, Dr. Gwinnell opined that, "I would accept that an individual with this level of symptomatology from PTSD and depression, requiring first inpatient, then residential, then intensive outpatient treatment, would be too impaired to function at any occupation during this time frame."

In a letter dated March 12, 2013, Standard notified Locke that her inability to work was contributed to or caused by a mental disorder and, therefore, she was not eligible for disability benefits under the Policy. Standard concluded that, "the medical documentation in your file supports that you are disabled due to PTSD and depression. The medical documentation also supports that you have fibromyalgia. However, we have insufficient documentation to support that you have limitations and restrictions from fibromyalgia preventing you from working. While we accept that you are disabled due to a mental disorder, your policy excludes payment if Total or Residual Disability is contributed to or caused by a mental disorder." (Filing No. 2 at ECF 69.)

Standard offered to review its original benefits decision; however, Locke declined. She commenced this action in state court, and Standard removed it to federal court, invoking this Court's diversity jurisdiction.[4]

Locke agrees that her mental and emotional conditions contribute to her disability. In her affidavit (Filing No. 31-2) she states: "The stress associated with my PSTD helps to contribute to my Fibromyalgia. The Fibromyalgia condition causes me stress that worsens the PTSD. The financial stress associated with no income worsens both conditions. It's difficult to differentiate what stress is worsening which condition." (*Id*. at ECF 1 ¶ 3.)

---

[4] Locke is a resident of Omaha, Nebraska. (Complaint, Filing No. 1-1 at ECF ¶ 1). Standard is an Oregon corporation with its principal place of business in Oregon. (Affidavit of Nicholas K. Rudman, counsel for Defendant, Filing No. 1-3.) The amount in controversy exceeds $75,000. (The Policy provides disability benefits in the amount of $3,900 per month to the insured, up to age 67. Locke was 32 years of age at the time the Policy was issued, and therefore under age 42 at the time of her claim. See Filing No. 23 at ECF 5.)

Locke also submitted the affidavit of Dr. Feely, dated August 21, 2014 (Filing No. 31-1), in which he confirms that the physical and mental limitations associated with Fibromyalgia cause Locke's inability to perform the duties of a Physician's Assistant on a full time basis (*id*. at ECF 1-2 ¶ 5), and she would be likely to miss about four days of work per month, if she tried to work full time (*id.* at ECF 7). In a Medical Source Statement dated May 5, 2014, Dr. Feely noted that Locke's symptoms, signs, and associated conditions included depression and anxiety disorder, and that emotional factors contributed to the severity of her symptoms and limitations. (*Id.* at ECF 4-5.)

## STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir 2011). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by

8

'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

**DISCUSSION**

Locke's Complaint presents two theories of recovery. Her first theory is based on contract, asserting that she has presented a valid claim for disability benefits under the Policy, and is entitled to payment. Her second theory asserts that Standard breached an implied covenant of good faith and fair dealing by denying her disability benefits under the Policy.

**I. The Parties' Contract**

Standard does not dispute that Locke is disabled. Locke does not dispute that her mental and emotional conditions, including PTSD and anxiety disorder, have caused or contributed to her disability; and she does not dispute that those conditions are listed in the Diagnostic and Statistical Manual of Mental Disorders. She also acknowledges that her mental and emotional conditions are excluded illnesses under the endorsement. She contends, however, that two other clauses in the Policy conflict with the clause in the endorsement relied upon by Standard and should govern:

> CONCURRENT DISABILITY - If a Disability is caused by more than one Injury or Sickness, or from a combination, it is a Concurrent Disability. We will pay benefits for a Concurrent Disability as if there was only one Injury or Sickness. In no event will You be considered to have more than one Disability at the same time. Once a continuous period of Disability starts, it will be one period of Continuous Disability no matter what Injuries or Sicknesses, or how many, cause the Disability to cause it to continue.

Filing No. 23 at ECF 10.

> LIMITATION FOR MENTAL DISORDER AND/OR SUBSTANCE ABUSE-
> Except as noted below, payment of Disability Benefits is limited to a total of 24 months during Your entire lifetime for Disability caused or contributed to by one or both of the following, or by medical or surgical treatment for one or both of the following:

   1. Mental Disorder; and/or

   2. Substance Abuse.

   This limitation does not apply to any period during which You are confined in a Hospital solely because of a Mental Disorder.

*Id*. at ECF 14.

Locke notes that the endorsement provides: ""PART OF POLICY - this endorsement is part of the policy to which it is attached. All terms of the policy which do not conflict with this endorsement will apply to this endorsement." Because the two sections of the Policy relied upon by Locke *do* conflict with the endorsement, she infers that those two sections do *not* apply to the endorsement and, therefore are not limited by the terms of the endorsement. At a minimum, she suggests that the Policy terms, including those of the endorsement are ambiguous and should be construed in her favor.

The Nebraska Supreme Court has said:

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

Whether an insurance contract is ambiguous and therefore in need of construction is a question of law. *Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 566 N.W.2d 382 (1997).

A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Callahan v. Washington Nat. Ins. Co., supra*. But the fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous. *Id*.; *Moller v. State Farm Mut. Auto. Ins. Co., supra.*

Interpretation of an unambiguous term or provision in an insurance policy presents a question of law. *Callahan v. Washington Nat. Ins. Co., supra; American Family Ins. Group v. Hemenway,* 254 Neb. 134, 575 N.W.2d 143 (1998).

11

> While an ambiguous insurance policy will be construed in favor of the insured, ambiguity will not be read into policy language which is plain and unambiguous in order to construe against the preparer of the contract. *Callahan v. Washington Nat. Ins. Co.*, supra; *American Family Ins. Group v. Hemenway*, supra.

*Tighe v. Combined Ins. Co. of Am.*, 628 N.W.2d 670, 675 (Neb. 2001).

> Generally, where the event for which an insured seeks coverage is plainly outside the scope of the coverage encompassed in the policy according to a plain reading of its terms, an insurer may not be obligated to provide coverage to the insured. *Neff Towing Serv. v. United States Fire Ins. Co.*, 264 Neb. 846, 652 N.W.2d 604 (2002). An insurance contract is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. *Finch v. Farmers Ins. Exch.*, 265 Neb. 277, 656 N.W.2d 262 (2003).

*City of Scottsbluff v. Employers Mut. Ins. Co.*, 658 N.W.2d 704, 710 (Neb. 2003).

The Nebraska Supreme Court's "goal in interpreting insurance policy language is to give effect to each provision of the contract," *Wheeler v. McCrary*, 842 N.W.2d 100, 107 (Neb. 2014). When interpreting "the language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them." *Cincinnati Ins. Co. v. Becker Warehouse, Inc.*, 262 Neb. 746, 756, 608 N.W.2d 592, 598 (2001) (citing *Austin v. State Farm Mut. Auto. Ins. Co.*, 261 Neb. 697, 625 N.W.2d 213 (2001)). The Nebraska Supreme Court also said: "When general and **specific terms** in a contract relate to the same thing, the more specific provision controls." *Hans v. Lucas*, 703 N.W.2d 880, 883 (Neb. 2005) (emphasis in original) (citing *Krzycki v. Genoa Nat. Bank*, 496 N.W.2d 916 (Neb. 1993)). The interpretation of the Policy is a question of law; and this Court finds the terms of the Policy and endorsement to be unambiguous. Giving effect to both the provisions in the endorsement and the Policy, this Court finds that (1) the language in the Policy under the heading "CONCURRENT DISABILITY" does not include disabilities caused in whole or part by a mental disorder because the endorsement

12

clearly states that "mental, emotional or behavioral disorder or condition" is not a covered disability; and (2) the language in the Policy under the heading "LIMITATION FOR MENTAL DISORDER AND/OR SUBSTANCE ABUSE" sets a cap on potential payments for disability caused in whole or part by a mental disorder, but does not guarantee any payment for such disability.

Locke's suggested interpretation of the Policy and endorsement is unreasonable, because it would nullify language in the endorsement and would not give effect to the intent of the parties at the time the contract was made.[5] "The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous." *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 152, 608 N.W.2d 592, 598 (2000). Because this Court finds the terms of the policy and endorsement unambiguous, and because Locke's mental and emotional conditions–PTSD and anxiety disorder–caused or contributed to her disability, benefits are not due and owing under the Policy.

## II. Covenant of Good Faith and Fair Dealing

"[I]n order to establish a claim for bad faith, a plaintiff must show an absence of a reasonable basis for denying the benefits of the insurance policy and the insurer's

---

[5] When construing conflicting provisions in an insurance policy and a policy endorsement, other state Supreme Courts have held that the terms of the endorsement supersede the conflicting terms of the original policy. See *Commercial Standards Ins. Co. v. General Trucking Co.*, 423 So.2d 168 (Ala. 1982); *Abco Tank & Mfg. Co. v. Federal Ins. Co.*, 550 S.W.2d 193, 198 (Mo. 1977); and *Wyatt v. Wyatt*, 239 Minn. 434, 437 (1953). This Court finds it unnecessary to speculate about how the Nebraska Supreme Court would address that question.

_____.

knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *LeRette v. Am. Med. Sec., Inc.*, 705 N.W.2d 41, 47-48 (Neb. 2005). "[A]n insurance company has a right to debate a claim that is 'fairly debatable,' or subject to a reasonable dispute, without being subject to a bad faith claim." *Williams v. Allstate Indem. Co.*, 669 N.W.2d 455, 460 (Neb. 2003)). "Whether a claim is fairly debatable is appropriately decided by the court as a matter of law, and such determination is based on the information available to the insurance company at the time the demand is presented." *Radecki v. Mut. of Omaha Ins. Co.*, 583 N.W.2d 320, 326 (Neb. 1998) (citation omitted).

Standard's denial of benefits was reasonable as a matter of law, and Locke's theory of recovery based on the implied covenant of good faith and fair dealing fails.

Accordingly,

IT IS ORDERED:

1. Defendant Standard Insurance Company's Motion for Summary Judgment (Filing No. 20) is granted;

2. Plaintiff's Complaint (Filing No. 1-1) is dismissed, with prejudice;

3. Any pending motions are denied as moot; and

4. A separate Judgment will be entered.

DATED this 12th day of September, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge